IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:07cr126

| | |
|---|---|
| UNITED STATES OF AMERICA, ) ) Plaintiff, ) ) Vs. ) ) NOEL TAVAREZ-ROJAS, ) ) Defendant. ) _____ ) | MEMORANDUM AND RECOMMENDATION |

**THIS MATTER** is before the court upon defendant's Motion to Suppress. Having carefully considered defendant's Motion to Suppress and reviewed the pleadings, the court enters the following findings, conclusions, and Recommendation.

## FINDINGS AND CONCLUSIONS

### I. Procedural Background

Defendant is charged in a two-count Bill of Indictment with transportation of an illegal alien and with unlawful reentry into the United States after deportation. Defendant has moved to suppress evidence seized or obtained after the vehicle in which he was a front-seat passenger was stopped on November 17, 2007, by Asheville Police Officer Sonia Escobedo. Defendant has standing to challenge the stop and the search even though he was only a passenger. Brendlin v. California, \_\_\_

1

U.S. ___, 127 S.Ct. 2400 (2007). On February 12, 2008, the court set this matter for hearing on February 19, 2008, and directed the government to file its response not later than February 15, 2008, and defendant interposed no objection to the government's late filing on February 19, 2008.

## II. Factual Background

### A. Officer Escobedo

An evidentiary hearing was conducted on February 19, 2007. At that hearing, the United States called as it's sole witness Officer Escobedo, the officer who stopped the vehicle in which defendant was a passenger. Officer Escobedo testified that at approximately 9:30 a.m. on Saturday, November 17, 2007, she was on duty in a marked patrol vehicle when she responded to a call to bring her canine and travel to Black Mountain, North Carolina. In traveling to such call, she stated she saw a white van which was headed East on Interstate 40 traveling some 10 miles per hour under the posted speed limit. She testified what drew her attention and concern was what she perceived to be a loose rear bumper and a partially open rear cargo door. Officer Escobedo then entered the license plate number into NCIC and the plate number was reported back to her as being proper and in order. The officer then drove alongside the vehicle and attempted to gain the driver's attention through hand signals, honking her horn, and activation of white alley lights. Officer Escobedo

testified that she took such actions to get the driver's attention to alert him to what she perceived to be safety issues with his vehicle that could endanger the motoring public. Rather than respond, Officer Escobedo reported the driver became rigid with his hands at the 10 and 2 position, and the driver failed to make eye contact with the officer. At that point, the officer reduced her speed and allowed the driver to get in front of her and then activated her blue lights. Eventually, after the officer followed the van for about a mile and one half, the driver pulled to the side of the highway. The officer then approached the vehicle from the passenger side, observed that the defendant (seated in the front passenger seat) was asleep, without a buckled seat belt, and wrapped in a blanket. She also observed that three other men, in addition to the driver and front seat passenger, were in the vehicle seated in the rear. When asked to produce a license and registration, the driver acted nervous and did not produce a license. The driver looked over to defendant, who looked for the registration and then handed it to the officer.

At that point, the officer asked the driver to exit the vehicle. When again asked to produce a driver's license, the driver told the officer that he had lost the license in Nashville. When the officer told him why the van was pulled over and pointed out the condition of the bumper and rear cargo door, the driver told her it was not his van and he was only helping the front-seat passenger, defendant herein, drive.

3

The court notes that while all the occupants of the vehicle were citizens of Mexico, there was apparently no language barrier, inasmuch as the officer is a Mexican-American fluent in both Spanish and English.

After the driver indicated that the van was not his and that he was only helping defendant, Officer Escobedo then approached defendant concerning the ownership of the vehicle. Defendant stated that it belonged to a friend in Phoenix, Arizona, who had loaned it to him for purposes of going to Charlotte, North Carolina, to look for work. The driver, however, had earlier stated to the officer that they were traveling to Raleigh, North Carolina, to look for work.

Defendant then produced a document, which the officer identified as being a fake Mexican identification, $350 in cash, a Sun Trust debit card, and a list of names and account numbers of individuals in different states. Defendant stated he was from Atlanta and he had just met the passengers. Besides one backpack, the officer noticed a lack of luggage.

Thereafter, the officer interviewed the remaining passengers, who told her they were all in the country illegally and they had paid $2000.00 each to be transported over the border illegally.

Officer Escobedo then asked the driver whether he was transporting contraband. Although nodding in the affirmative, the driver said no. She then asked

the driver for consent to search the vehicle, which the driver granted. The officer then told the driver she intended to do a search with a trained dog, and he again consented to the search. After the dog alerted as to several locations, and after tool marks had been observed on the bumper and the rear cargo door, the officer had the vehicle transported to the city's inspection bay for a hand search, and all defendants were taken into custody. While other officers handled the actual search, Officer Escobedo went to the state magistrate's office and discussed with such magistrate whether she should issue tickets for state violations. She testified the magistrate advised her not to issue any tickets inasmuch as all the occupants of the vehicle were being held for the Bureau of Immigration and Customs Enforcement.

After the hand search was completed by other officers, Officer Escobedo went to the inspection bay and made sure the vehicle was secure before it was towed to an impound lot. Apparently, she attempted to tighten down the cargo door strike plate. The door then latched.

### B. Community Defender Investigator Jim Allard

Jim Allard, the investigator for the Community Defender's Office, testified for the defendant that he went to the impound lot to inspect the vehicle. He took photographs of the vehicle and performed certain tests. Apparently, due to a defect in the strike plate, the cargo door did in fact latch even though it appeared from the

outside to be ajar. He also tested the rear bumper by standing thereon and jumping up and down, with the bumper not falling off. Mr. Allard is a man of considerable size, being over six feet tall and weighing in excess of two hundred and twenty pounds.

### III. Standard Applicable to a Motion to Suppress

Motions to suppress are mixed questions of law and fact that are disposed of by the court without the assistance of the jury. United States v. Stevenson, 396 F.3d 538 (4th Cir. 2005); Fed.R.Crim.P. 12(b)(3)(C), 12(d); Fed.R.Evid. 104(a). When a defendant moves to suppress evidence seized based on an investigatory stop, the United States Supreme Court has held that the

> Fourth Amendment protects citizens from 'unreasonable searches and seizures' by the government, and its protections extend to brief investigatory stops ... that fall short of traditional arrest."

United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)). In those situations, the court looks to whether the actions of law enforcement are supported by a reasonable articulable suspicion that criminal activity "'may be afoot." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, supra, at 30). To determine whether an investigatory stop meets the requirements of the Fourth Amendment, a court must "look at the 'totality of the circumstances'" to see

whether the detaining officer had a " 'particularized and objective basis' for suspecting legal wrongdoing." Arvizu, supra, at 273. The court's inquiry is objective rather than subjective, in that the Fourth Amendment inquiry "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," not what an officer thought or anticipated at the time. Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (citation and quotations omitted).

IV. **Discussion**

    A. **Lawfulness of a Vehicle Stop**

The teachings of the Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968), and its progeny govern this court's inquiry. Under Terry, if an officer has a reasonable articulable suspicion that criminal activity is afoot - - that is, that a person has just committed or is about to commit a crime - - he may seize such person and, if he reasonably fears the person is armed and dangerous, may conduct a frisk for weapons. Id  A reasonable suspicion will also support a stop for the limited purpose of questioning. Florida v. Royer, 460 U.S. 491, 498 (1983).

Whenever an investigative stop is based on less than probable cause, it "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Id., at 500. An ordinary traffic stop is classified as a "limited detention" and is governed by Terry standards. United States v. Rusher, 966 F.2d 868 (4th Cir.),

7

cert. denied, 61 U.S.L.W. 3285 (U.S. 1992). An officer can do no more than ask for a driver's license and vehicle registration, run a computer check, and issue a citation during an *ordinary* traffic stop. Id.

An "articulable and reasonable suspicion" requires some minimal level of objective justification for the stop, which must be more than an unparticularized "hunch," but less than the level of suspicion required for probable cause. United States v. Sokolow, 490 U.S. 1 (1989); United States v. Hensley, 469 U.S. 221 (1985); United States v. Hines, 943 F.2d 348 (4th Cir.), cert. denied, 60 U.S.L.W. 3405 (U.S. 1991). A "totality of the circumstances" test is used to determine the existence of a reasonable suspicion of criminal conduct. United States v. Sokolow, supra. Factors to be considered in measuring the reasonableness of a stop include:

    a.    the area's disposition toward criminal activity;

    b.    the time of the stop; and

    c.    any suspicious conduct assessed in light of the officer's experience.

Id.

**B.    Defendant's Contentions**

In this case, defendant contends that the stop was unlawful because the officer had no lawful reason to turn on her blue light and stop the vehicle. Defendant

contends that the driver of the van had not committed any moving or equipment violation of the traffic laws of North Carolina. Further, defendant contends that once the officer pulled the vehicle over, she had no right to ask for the operator's license and registration "given the absence of a law violation."

    C.    **Discussion of the Issue Presented**

        1.    **Was the Officer's Action Was Justified at Inception?**

Defendant initially challenges the stop under the first prong of Terry, which requires this court to determine whether the officer's action was justified at inception. See Terry, supra, at 19-20. In determining whether a stop was proper, the court is required to consider the "totality of the circumstances." The totality of the circumstances justifying the stop in this case does not end with the officer's observations of the defective bumper and partially ajar cargo door, but also includes the officer's observation of the driver when she came alongside his vehicle in an attempt to warn him of the safety concerns.

First, the court finds that a lawful Terry stop can be based on a public safety concern and does not always require that the officer have a reasonable articulable belief that criminal activity is afoot. A Terry stop may also be appropriate where the officer has a reasonable articulable belief that a motorist, while not engaged in unlawful driving, poses a threat to public safety or himself, or appears to be in need

of assistance. In State v. Norman, 136 Ohio App.3d 46 (1999), the Court of Appeals of Ohio held, as follows:

> Clearly, under appropriate circumstances a law enforcement officer may be justified in approaching a vehicle to provide assistance, without needing any reasonable basis to suspect criminal activity. *See State v. Langseth* (N.D.1992), 492 N.W.2d 298, 300; *State v. Brown* (N.D.1993), 509 N.W.2d 69; *People v. Murray* (1990), 137 Ill.2d 382, 148 Ill.Dec. 7, 560 N.E.2d 309; *Crauthers v. Alaska* (Alaska App.1986), 727 P.2d 9; *State v. Pinkham* (Me.1989), 565 A.2d 318; *State v. Marcello* (Vt.1991), 157 Vt. 657, 599 A.2d 357; *State v. Oxley* (N.H.1985), 127 N.H. 407, 503 A.2d 756. Police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out "community caretaking functions" to enhance public safety. The key to such permissible police action is the reasonableness required by the Fourth Amendment. When approaching a vehicle for safety reasons, the police officer must be able to point to reasonable, articulable facts upon which to base her safety concerns.

Id., at 54. In this case, Officer Escobedo clearly articulated reasonable concerns she had for the safety of the motoring public, to wit, that an accident could be caused if the van's rear bumper fell off or if cargo fell out of what she perceived to be an unlatched and partially open rear cargo hatch. Clearly, Officer Escobedo had an objective articulable reason to stop the vehicle in this case. To hold otherwise would be to mandate that officers turn a blind eye to conditions that while unsafe are not unlawful, a result not required by the fourth amendment or common sense. It also appears that the officer informed the driver of her concerns as to the bumper and cargo door after she asked him to step out of the vehicle, which further bolsters the

reasonableness of the stop. See United States v. Tibbetts, 396 F.3d 1132 (10th Cir. 2005) ("police officer's failure to address the purported violation giving rise to the stop, while not dispositive of the Fourth Amendment question, is one of the circumstances that courts may evaluate against this touchstone," id., at 1139).

In the alternative, and based on the testimony of the officer, it appears that a totality of the circumstances may also include the driver's reaction when the officer attempted to alert him to the problems with his van. As discussed above, the evidence presented indicates that the officer was in a marked police unit with a light bar on the roof, that she activated her alley lights, waived, and blew her horn in an attempt to get the driver's attention. She testified that he failed to even acknowledge her presence and that he became rigid, placing his hands at the 10 and 2 positions on the steering wheel. The Court of Appeals for the Fourth Circuit has long held that when there are other factors present arousing the suspicions of a police officer, the fact that defendants turned away from approaching police officers gave such officers reasonable suspicion to stop the suspect. United States v. Bull, 565 F.2d 869 (4th Cir. 1977). While initially only concerned with vehicle or public safety issues, it appears clear that Officer Escobedo's suspicions that criminal activity was afoot were aroused when the driver refused to acknowledge her presence. Objective facts and circumstantial evidence suggesting that a particular vehicle or its occupants are

involved in criminal activity provide a sufficient basis to justify an investigatory stop of a vehicle. United States v. Cortez, 449 U.S. 411 (1981); Delaware v. Prouse, 440 U.S. 648 (1979); United States v. Taylor, 857 F.2d 210 (4th Cir. 1988).

> 2. **Was the Police Action Reasonably Related in Scope to the Circumstances Which Justified the Interference in the First Place?**

Finally, while not fully flushed out in the defendant's memorandum or in the arguments of respective counsel at the hearing, defendant may also be arguing that the time between the stop and the discovery of what may be incriminating evidence exceeded the scope allowed under the second prong of Terry. See Terry, supra, at 20.

> A seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

Illinois v. Caballes, 543 U.S. 405, 407 (2005). An investigative stop, to be reasonable, must also be limited in duration. United States v. Sharpe, 470 U.S. 675 (1985). There are no artificial time limits for a Terry stop; however, it must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Florida v. Royer, supra.

In this case, there is no evidence that the officer did anything to either delay or prolong the investigatory stop. Instead, defendant argues that the officer had no right to ask for the driver's license and registration of his driver where the basis for the stop is public welfare. Defendant argued, by way of example, that an officer who stops an individual on a sidewalk to warn him that his shoe is untied has no right to demand that he produce identification. The court would agree that in such an example it would be unreasonable to require the pedestrian to produce identification. Indeed, such a finding would be mandated under <u>Brown v. Texas</u>, 443 U.S. 47 (1979). Unlike a pedestrian, whose travel on a sidewalk is a right and not a privilege subject to licensure, registration, or insurance, operators of motor vehicles are required to have a license, registration, and proof of insurance to operate a motor vehicle upon a North Carolina highway. Further, the United States Supreme Court has held that an officer's request that an individual identify himself "has an immediate relation to the purpose, rationale, and practical demands of a <u>Terry</u> stop." <u>Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.</u>, 542 U.S. 177, 188 (2004).

Not only was the officer well within the bounds of the fourth amendment to ask for identification based on the stop for public safety, her observations of the driver when pulled her vehicle alongside his further reinforced this need. Indeed, based on

a totality of the circumstances this officer faced on that day, the officer properly asked the driver for his license and registration, and the driver's inability to produce a license and his directing the officer to defendant herein to explain the registration led the officer to make further reasonable inquiry as outlined above.

### 3. Defendant's Evidence Concerning the Strength of the Bumper and the Latching of the Cargo Door

At the hearing, defendant presented evidence that the van's bumper could withstand a man jumping on it, despite it being nearly detached, and that the cargo door, while it appeared to be either ajar or not flush, was in fact latched. The Fourth Amendment inquiry "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," not what an officer thought or anticipated doing at the time. Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (citation and quotations omitted). While the court has no doubt as to the legitimacy of defendant's findings, it does nothing to nullify the reasonableness of the stop based on the danger the officer perceived on November 17, 2007.

### 4. Conclusion

Finding that the officer complied with Terry in stopping the vehicle, and that such stop was limited in duration and scope and lasted no longer than was necessary to effectuate the purpose of the stop, the undersigned is compelled to recommend that

defendant's Motion to Suppress based on an allegedly unlawful stop be denied. Defendant has not made a substantive argument for suppression based on the consent of the driver and such is not now before the court.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendant's Motion to Suppress (#17) be **DENIED.**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed on or before **FEBRUARY 29, 2008.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: February 21, 2008

Dennis L. Howell
United States Magistrate Judge